CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

September 18, 2025

LAURA A. AUSTIN, CLERK
BY:  s/J.Vasquez
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

|  |  |  |
|---|---|---|
| **JAMES PORTER MARINE, JR.,** | ) | |
| Plaintiff, | ) | Case No.7:22cv00682 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **SARAH EVES,** | ) | By:  Pamela Meade Sargent |
| Defendant. | ) | United States Magistrate Judge |
| | ) | |

Defendant Sarah Eves, ("Eves"), through counsel, has filed a Motion to Dismiss and a Motion for Summary Judgment supported by affidavits and medical records. (Docket Item Nos. 62, 64.)  Plaintiff, James Porter Marine, Jr., ("Marine"), a Virginia inmate proceeding pro se, has responded to these motions, making them ripe for consideration.  After review of the parties' submissions, the court concludes that the defendant's motions must be granted.

## I. BACKGROUND.

In the initial Complaint, (Docket Item No. 1), Marine sued Eves, a physician assistant, ("PA Eves"), and her employer, Wellpath LLC.[1]  While Marine was confined at the Henry County Adult Detention Center, ("HCADC"), PA Eves removed stitches from his dog bite wounds earlier than a doctor had allegedly recommended.  The defendants moved to dismiss, and Marine responded by moving to amend.  The court granted the motions in part and denied them in part; the court dismissed the claims against Wellpath and HCADC officials named in the proposed Amended Complaint and all claims for prospective relief, but allowed Marine's

---

[1]  Marine's initial Complaint identified Eves's employer as Medpath, but the court later granted Marine's Motion to Amend to change the employer's name to Wellpath.

amended claims against PA Eves for monetary damages to go forward. *See Marine v. Eves*, No. 7:22cv00682, 2024 WL 1201616 (W.D. Va. Mar. 20, 2024).

The court summarized Marine's allegations from the Complaint and the Amended Complaint as follows:

> On August 19, 2022, a police dog bit Marine on his legs and his left torso. Law enforcement officers transported him to a hospital where he "rec[ei]ved stitches and was mandated removal in 10 to 14 days."[2] (Docket Item No. 35 at 4.)  On August 21, 2022, defendant [PA] Eves … had Marine brought to the medical unit and removed his stitches. (Docket Item No. 35 at 2, 4.)  Marine asserts that [PA] Eves, "an employee of Wellpath," (Docket Item No. 35 at 2), "removed stitches before enough time for them to heal, causing soreness, infection and a very much longer healing process."  (Docket Item No. 1 at 2.)  Marine claims that he told [PA] Eves, the "E.R. doctor said [the stitches] would need to stay in for [10 to 14 days], but she refused to listen."  (Docket Item No. 1 at 2.)  He alleges that she "disregarded [his] medical orders and agonizing, protested pleas not to remove [his] unhealed stitches." (Docket Item No. 35 at 4.)  Marine alleges that Eves's actions caused "'debilitating physical impairments' due to [his] injuries not being able to heal."  (Docket Item No. 35 at 4.)  The wounds allegedly became "infected, swollen, and oozing with blood and yellow and green pus." (Docket Item No. 35 at 5.)  Marine also alleges that [PA] Eves "failed to put notes or medical orders in [his] file" for a month and a half. (Docket Item No. 1 at 2.)  Marine asserts that a "new doctor, Dr. Jenkins, verbally admitted that she handled [Marine's] situation wrong."  (Docket Item No. 1 at 2.)
> 
> . . . .
> 
> Marine also alleges that [PA] Eves's actions constituted medical malpractice, a claim he asserts under the supplemental jurisdiction of the court, pursuant to 28 U.S.C. § 1367.  Marine alleges that her actions caused him "to suffer blood clots in [his] legs, to date, unhealed wounds and physical and mental impairments."  (Docket Item No. 35 at 7.) Marine allegedly must walk with a cane and has developed a

---

[2] Marine claims that at "SOVAH" hospital, he received "stitches in [his left] leg on the early morning of 8-19-22 for serious dog bites."  (Docket Item No. 1 at 2.)

subcutaneous mass in his torso where the dog bit him. (Docket Item No. 35 at 7.)

Marine claims that later medical treatment he has received was made necessary because of the defendants' failure to provide him access to proper medical care at HCADC from August 19, 2022, to February 15, 2023. (Docket Item No. 35 at 8.) He has submitted a one-page "After Visit Summary" from Sentara RMH Medical Center Emergency Department dated March 10, 2023. (Docket Item No. 28-1.) It notes diagnoses of deep vein thrombosis of left profunda femoris vein, subcutaneous mass of abdominal wall, and enlarged pulmonary artery. The summary states that Marine should follow up with the vascular surgeon within one week, be tested for a possible clotting disorder and recommends "wound care if the dog bites are not healing adequately." (Docket Item No. 28-1.) The summary also notes a prescription for a blood thinner medication. (Docket Item No. 28-1.)

At some point, Marine alleges that he was seen by a general surgeon regarding a "[subcutaneous] mass in [his] torso from the dog bites." (Docket Item No. 35 at 7.) He also was allegedly seen by a vascular surgeon and a primary care provider for pain management and treatment for thrombophlebitis. (Docket Item No. 35 at 8.)

*Marine*, 2024 WL 1201616, at *1-2 (footnotes omitted).

The court liberally construed Marine's amended claims against PA Eves as alleging that (1) she "defied a previous doctor's orders by removing Marine's stitches too early," in violation of the Eighth Amendment and Virginia medical malpractice law, and (2) "when complications arose from [PA] Eves's action, [she] . . . failed to provide pain medication and other treatment by medical providers outside the HCADC facility." *Marine*, 2024 WL 1201616, at *2. As relief, he seeks monetary damages.[3]

---

[3] Marine also seeks declaratory and injunctive relief. Because the record indicates that he no longer is confined at the HCADC, the court concludes that his prospective forms of relief are now moot. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive . . . relief with respect to his incarceration there."); *see also Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)

## II.  Discussion.

### A.  The Motion to Dismiss.

#### 1.  *The Motion to Dismiss Standard.*

A motion to dismiss under Rule 12(b)(6) examines the legal sufficiency of the facts alleged on the face of a plaintiff's pleading.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999).  In considering a motion to dismiss, all well-pleaded factual allegations contained in a complaint are to be taken as true and viewed in the light most favorable to the plaintiff.  *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  The complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and it must allege facts specific enough to raise a right to relief above the speculative level.[4]  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The court is required to liberally construe complaints filed by plaintiffs proceeding pro se.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  A pro se litigant's verified complaint or other verified submissions must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge."  *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (quoting *Williams*, 952 F.2d at 823.  Where a pro se plaintiff fails to respond to defendants' specific evidence contradicting the conclusory allegations of his complaint, however, defendants may be entitled to summary judgment.  *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992)

---

(holding that transfer rendered moot a prisoner's claims for injunctive and declaratory relief, but not his claims for damages).

[4]  The court has omitted citations, internal quotation marks and/or alterations throughout this Opinion, unless otherwise noted.

("[U]nsupported speculation is not sufficient to defeat a summary judgment motion.").

### *2. Applicable Law.*

In PA Eves's Motion to Dismiss, (Docket Item No. 62), she asserts that Marine's medical malpractice claim against her falls under Virginia's Medical Malpractice Act, Virginia Code Annotated § 8.01-581.1 *et seq.*, (the "Act"). The Act applies to "any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." VA. CODE ANN. § 8.01-581.1 (2024). As a physician assistant, PA Eves qualifies as a health care provider under the Act. *See* VA. CODE ANN. § 8.01-581.1. Thus, the Act's terms clearly apply to Marine's malpractice claim against her.

A plaintiff's medical malpractice claim must be pre-certified by a medical expert before service on the defendant. Specifically,

> [e]very complaint, counter claim, or third party claim in a medical malpractice action, at the time the plaintiff first requests service of process upon a defendant, . . . , shall be deemed a certification that the plaintiff has obtained from an expert witness whom the plaintiff reasonably believes would qualify as an expert witness pursuant to subsection A of § 8.01-581.20 a written opinion signed by the expert witness that states:
>
> BASED UPON A REASONABLE UNDERSTANDING OF THE FACTS, THE DEFENDANT FOR WHOM SERVICE OF PROCESS HAS BEEN REQUESTED DEVIATED FROM THE APPLICABLE STANDARD OF CARE AND THE DEVIATION WAS A PROXIMATE CAUSE OF THE INJURIES CLAIMED.

VA. CODE ANN. § 8.01-20.1(A) (Supp. 2025). Thus, before asking for this case to be served, Marine should have, by statute, obtained a written opinion from a medical expert qualified under the Act (i) that is based on reasonable facts, (ii) that certifies

PA Eves deviated from the standard of care applicable to a correctional physician assistant in August 2022, and (iii) that certifies that the deviation was a proximate cause of the harm that Marine claims, namely, the failure of his dog bite wound to properly heal and other medical complications.

The standard of care by which all health care defendants are judged in Virginia is "that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth."  VA. CODE ANN. § 8.01-581.20(A) (2024).

> A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

VA. CODE ANN. § 8.01-581.20(A).  To qualify as a standard of care expert against a healthcare defendant, the witness must satisfy both the knowledge requirement and the active clinical practice requirement under the statute.  *See Hinkley v. Koehler*, 606 S.E.2d 803, 806 (Va. 2005).  Thus, to support a plaintiff's claim that a defendant's medical decision was unreasonable under the circumstances, the expert must have his own education, training and experience in making the same decision under the same circumstances during the same time frame.  This two-part expert qualification test and other Virginia statutes related to the Act apply to federal cases like Marine's that raise a medical malpractice claim under Virginia law.  *See Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690-691 (4th Cir. 2011) (citing *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475–76 (4th Cir. 2005) (noting that in diversity cases, federal evidentiary law governs the procedural question of the admissibility of expert testimony, while state law controls substantive matters concerning the sufficiency of evidence on the malpractice claims)).

### 3. *Discussion.*

On July 3, 2024, after PA Eves was served, counsel sent a letter to Marine asking that he provide evidence of the statutory expert certification mandated under Virginia law to support his medical malpractice claims against PA Eves. (Docket Item No. 63-1). On July 24, 2024, counsel received a letter from Marine, conceding that he does not have the mandatory statutory expert certification for his claim. (Docket Item No. 63-2). Under Virginia Code Annotated § 8.01-20.1(D), "[i]f the plaintiff did not obtain a necessary certifying expert opinion at the time the plaintiff requested service of process on a defendant as required under this section, the court shall impose sanctions according to the provisions of § 8.01-271.1 and may dismiss the case with prejudice." *Smith v. Shenandoah Valley Care, Inc.*, 79 Va. Cir. 739, *2 (2008) (dismissing case because plaintiff had not obtained a written opinion signed by an expert witness at time of service). Based on Marine's failure to obtain the necessary expert certification, PA Eves has moved to dismiss his medical malpractice claim against her.

In response to the defendant's motion, Marine asserts that he is exempt from the medical expert certification requirement in Virginia Code Annotated § 8.01-20.1(A) because his negligence claim "do[es] not involve medical knowledge of specialized concerns of infection and/or the possible causes thereof." (Docket Item No. 69 at 2.) The court cannot agree.

It is well-established that "expert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages." *Goulet v. Hereford*, No. 7:19cv0701, 2022 WL 16936052, at *1 n.1 (W.D. Va. Nov. 14, 2022). The exception that Marine asks the court to apply provides that the

> certification [required under § 8.01-20.1(A)] is not necessary if the plaintiff, in good faith, alleges a medical malpractice action that asserts

a theory of liability where expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience.

VA. CODE ANN. § 8.01-20.1(B) (Supp. 2025). This exception applies only "in those rare cases in which a health care provider's act or omission is clearly negligent within the common knowledge of laymen." *Raines v. Lutz*, 341 S.E.2d 194, 196 n.2 (Va. 1986). Such clear negligence cases where no expert testimony was required include instances like a patient's fall on the way to the bathroom after a nurse failed to respond to a call light visible for more than 20 minutes, or like a patient becoming seriously ill after being given the wrong medication. *See Bush v. Thoratec Corp.*, 13 F. Supp. 3d 554, 571 (E.D. La. 2014) (describing exception to expert witness precertification requirement).

Marine's case does not fall under the § 8.01-20.1(B) exception. The alleged act of malpractice that Marine alleges against PA Eves is that she improperly treated his dog bite wound and prematurely removed his stitches. He claims that her actions lead to infection, slow healing and other medical complications. (Docket Item No. 35 at 7-8). Although Marine asserts that his stitches were originally ordered to be removed in 10 to 14 days, he offers no medical record or affidavit from a medical provider supporting this conclusory assertion on the appropriate time for the removal. (Docket Item No. 35 at 4.) In fact, the emergency room discharge paperwork indicated that the stitches should be removed "as directed by [Marine's] health care provider." (Docket Item No. 65-1 at 12.) Furthermore, no evidence in Marine's submissions indicates that he or any other person without medical education possesses common knowledge and experience capable of determining the optimal time to remove stitches from a dog bite wound or the extent of harm that would normally result from removing them sooner rather than later. It is self-evident that determining the proper treatment of infections, wounds and stitches requires

specialized medical knowledge and qualifications. Thus, I cannot find that the exception in Virginia Code Annotated § 8.01-20.1(B) applies to Marine's malpractice case.

Marine also argues that once the court has determined that the medical expert certification in § 8.01-20.1(A) is required in his case, the court should give him more time to obtain that certification. Marine also asserts that the court should provide funding and obtain the certification from an appropriate medical expert on his behalf because the court granted him in forma pauperis status. I find no merit to these arguments. The in forma pauperis status for which Marine qualified applies to permit him to pay the filing fee through installments from his inmate trust account, *see* 28 U.S.C. § 1915(b), and to have court officers arrange for service of the Complaint, *see* 28 U.S.C. § 1915(d). In general, however, the "rule is that a court may not authorize the commitment of federal funds to underwrite the necessary expenditures of an indigent civil litigant's action," such as witness fees, deposition costs, transcriptions or transportation to trial. *Moss v. ITT Cont'l Baking Co.*, 83 F.R.D. 624, 625, 626 (E.D. Va. 1979). Neither § 1915 nor any other authority provides for public funds to pay an expert medical witness or other costs to assist an indigent litigant in gathering evidence for his civil action. *See Ashford v. Gordon*, CA No. 0:13-1113-JFA-PJG, 2013 WL 5495280, at *1 (D. S.C. Oct. 2, 2013). Furthermore, Marine has had more than a year to obtain the required medical expert certification through his own efforts.

In accordance with the foregoing, the court will grant PA Eves's Motion to Dismiss Marine's medical negligence claim against her. This claim will be dismissed with prejudice, based on Marine's failure to comply with Virginia Code Annotated § 8.01-20.1(A). *See Parker v. United States,* 475 F. Supp. 2d 594, 597 (E.D. Va. 2007) (finding that because "plaintiff's claims do not fall within the

narrow common knowledge exception to the [the Act's] certification requirement, plaintiff's failure to obtain a certificate of merit is fatal to his claim").

B. The Summary Judgment Motion.

*1. The Summary Judgment Standard.*

Pursuant to Federal Rules of Civil Procedure Rule 56, the court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While the court is required to view the evidence and reasonable inferences drawn from it in the light most favorable to the plaintiff as the nonmoving party, the court will determine the reasonableness of the inferences in conjunction with "competing inferences to the contrary." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995). To defeat a summary judgment motion, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. *See Anderson*, 477 U.S. at 252.

A pro se litigant's verified complaint or other verified submissions must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman*, 986 F.3d at 498. Where a pro se plaintiff fails to respond to defendants' specific evidence contradicting the conclusory allegations of his complaint, however, defendants may be entitled to summary judgment. *See Baber*, 977 F.2d at 875 ("[U]nsupported speculation is not sufficient to defeat a summary judgment motion.").

*2. The Defendant's Evidence.*

PA Eves offers the following evidence in support of her summary judgment motion: two personal affidavits, (Docket Item Nos. 65-1 at 2-8, Ex. A; 72-1, Ex. A);

supporting medical records for Marine dated August-September 2022, (Docket Item No. 65-1 at 9-39, Ex. A); and an affidavit by Dr. Oscar Jerkins, M.D., (Docket Item No. 65-2, Ex. B).

PA Eves was employed by Wellpath and assigned to work at HCADC in August 2022. She left employment there on September 27, 2022, after she gave Wellpath advance notice that she would be resigning to accept a position as a physician assistant in Australia.[5]

While at HCADC, in her capacity as a physician assistant, PA Eves was allowed to prescribe and provide direct patient care under the license of a physician. During her employment, other providers worked at HCADC. PA Eves was present there approximately two days per week to conduct medical visits with patients, primarily in the medical clinic. She had no authority to supervise others on the HCADC medical staff, and she did not provide daily wound care, pass daily medications to patients or schedule appointments for them. When PA Eves examined a patient's wound, she would provide initial wound care, and nurses would perform subsequent dressing changes. Nurses would report to PA Eves any signs of infection, but if the nurses believed that symptoms indicated the wound was healing and reported no complications, PA Eves likely would not see the patient again for that wound. PA Eves did occasionally respond to questions from staff about a particular inmate's medical treatment. On rare occasions, she would go into the cell blocks to meet with an inmate.

---

[5] Marine has suggested that Wellpath fired PA Eves or urged her to leave, but he states no facts from his personal knowledge to support this bald accusation. PA Eves states that she has been employed at Queensland Health Toowoomba base hospital in Toowoomba, Queensland since she arrived in Australia in November 2022.

According to HCADC procedures, an inmate must submit a written Health Services Request to report his medical complaint or request for treatment. It is documented on Marine's medical intake on August 21, 2022, that he was notified of and understood the medical request procedure. PA Eves states that if an inmate had stopped her in the cell area to ask for medical attention, she would have reminded him to file a Health Services Request to be scheduled for an appointment with a provider. Again, PA Eves herself did not schedule inmate medical appointments.

PA Eves recalls some details about encounters she had with Marine. She had two documented visits with him about his dog bite wounds on August 19 and September 1, 2022. She states that, after September 1, 2022, she did not have any contact with Marine before she left employment at HCADC in late September 2022.

Marine was incarcerated at HCADC on August 19, 2022. Earlier that day, he was treated at Sovah Health Martinsville Emergency Department, ("Sovah ED"), for dog bite wounds he had received from a police dog while trying to escape officers. (Docket Item No. 65-1 at 21.) Sovah ED records indicate that Marine had superficial (meaning they were not deep) puncture wounds to his abdomen and a laceration on his left lower leg. Notes in the record indicate that "[a]t their worst, the symptoms [Marine exhibited] were moderate." (Docket Item No. 65-1 at 17.) The leg wound was loosely sutured, and the ED physician did not note how long the sutures should remain in place or when they could be safely removed. Rather, the Sovah ED Discharge Instructions state that the patient should "[h]ave the sutures removed as directed by your health care provider." (Docket Item No. 65-1 at 12.)

PA Eves saw Marine for a visit on August 19, 2022. She ordered Augmentin (an antibiotic to prevent infection) for 14 days and ibuprofen (as needed for pain) for five days. She noted the care provided at the Sovah ED. Marine reported to PA Eves that he had significant pain from his abdominal injuries. PA Eves examined him and recorded that the abdominal puncture wounds were very shallow, were not

bleeding and did not have any drainage. She noted that the laceration on Marine's left leg had been loosely sutured, meaning that the wound was not tightly closed by the stitches. PA Eves interpreted the nature of the sutures to indicate the emergency department physician's recognition that a dog bite wound is at high risk for infection and that closing the wound increases that risk. PA Eves explained this risk to Marine and recommended that he allow her to remove the sutures to reduce the risk of infection. Marine declined, and PA Eves did not remove the sutures. Thereafter, Marine's wounds were cleaned and wrapped, and he was provided ibuprofen for pain. PA Eves noted that Marine should be seen daily for dressing changes, that he had been given an antibiotic, Augmentin, as a prophylactic to prevent infection, and that she planned to see him for a follow up visit in two weeks, when he had finished the antibiotic.

A nurse noted on August 21, 2022, that Marine still had sutures in his left leg and already had scabbed areas on his abdomen. The record does not note any abnormalities or symptoms observed during the exam that day.

PA Eves states that she recalls removing the loose sutures on Marine's leg laceration approximately a week after he arrived at HCADC. She does not remember how or why he came to her attention. She states that while working at HCADC, she always documented her direct patient care. She routinely recorded her notes on paper simultaneously with the patient care she provided, and the medical staff later entered the information from the paper record into the electronic medical record. PA Eves does not know why the removal of Marine's leg stitches was not recorded in the electronic medical record at HCADC.

PA Eves recalls that when she examined Marine's leg that second time, the wound was beginning to show some signs of infection, erythema (redness) and warm skin. PA Eves reports that dog bites have a high risk of infection because of exposure to bacteria from the animal's mouth. For that reason, she states, it is standard

practice to leave a dog bite wound un-sutured to reduce the risk of infection. Although she did not agree with the emergency department provider's suturing of Marine's leg wound, PA Eves had left the stiches in at Marine's request on August 19, 2022.  In her opinion, it would have been appropriate to remove the sutures that day to lower the risk of infection and allow the wound to heal.  At PA Eves's second meeting with Marine, she talked to him about removing the sutures and explained her reasoning.  She recalls that Marine agreed to removal of the sutures and did not ask her to leave them in.  PA Eves states that she did not tell Marine (and would never tell him or any patient) to "wipe [his] pussy," as he alleges.  (Docket Item No. 35 at 4; Docket Item No. 65-1 at ¶ 9.)  She further reports that, if Marine had told her that day that he did not want her to remove the sutures, she would have cautioned him again about the risk of infection, but she would have adhered to his wishes.  She states that she cannot, and does not, force treatment on patients.[6]  PA Eves also states that she did not tell Marine that he could not get outside medical care because of his indigency, as he alleges.

Records show that on August 26, 2022, nursing staff entered an order for ibuprofen for Marine for another five days, as needed.

PA Eves met with Marine for a follow-up exam on September 1, 2022.  PA Eves states that she was not aware of any complaints from Marine between her August 19 and September 1, 2022, visits with him.  HCADC records also indicate that Marine did not report any complaints to the medical staff or file any Healthcare Services Requests between the two visits.

---

[6]  Marine claims that video footage of PA Eves removing the sutures would prove that he did not consent to the procedure.  PA Eves states that HCADC "does not have video recording inside the medical clinic to protect patient privacy."  (Docket Item No. 72-1 at n.2.)

On September 1, 2022, PA Eves examined Marine's abdominal wounds. She noted bruising with an indurated (hardened) area below the puncture wounds, but no sign of infection. Staff applied a warm compress to that area, and PA Eves entered an order to continue warm compresses on his abdomen, with follow up in one week, and for hot packs for pain for five days. PA Eves then examined Marine's lower left leg wound. She recorded no report from Marine of any pain or symptoms of infection, and she noted her own observation that the wound showed no sign of infection and appeared to be healing well. Her notes indicate that she explained to Marine how dog bite wounds typically take longer to heal than other types of wounds. She also noted that Marine was a longtime smoker (half a pack per day), a habit that can slow the healing process.

Medical records show that Marine submitted a Health Services Request form on September 12, 2022, stating that his leg was swollen, was leaking "yellow pus-like fluid" and was hurting. (Docket Item No. 65-1 at ¶ 15.) Nursing records indicate that a nurse examined Marine the same day, noting observation of a small amount of drainage and documenting that Marine was scheduled to be seen by the provider. PA Eves reports that she was not aware of this September 12, 2022, Request form at the time it was filed or the September 12, 2022, exam. She states that it is not unusual for a healing wound to have a small amount of drainage and that the nurse's notes from the September 12, 2022, exam do not indicate any sign of infection and characterize Marine's medical visit as routine, rather than  as requiring an urgent visit or urgent medical care.

PA Eves states that she remembers one occasion when Marine stopped her as she was leaving the cell area and asked to be scheduled for an appointment. (Docket Item No. 72-1 at ¶ 7.) She reminded Marine to submit a Health Services Request, because she did not make appointments and could not do so while in the cell area. PA Eves does not remember the date of this encounter.

Medical records show that orders were entered under PA Eves's name for Marine on September 23, 2022, for wound care for 14 days and for the antibiotic Bactrim for 10 days. PA Eves does not remember making these orders, and she does not remember that anyone reported to her any signs that Marine's dog bite wound was showing any signs of infection. (Docket Item No. 72-1 at ¶ 8.) She states, however, that it would be appropriate and cautious to continue antibiotics for a dog bite laceration, as they typically heal slowly, and to change to another type of antibiotic to prevent infection from developing. PA Eves also states it would have been appropriate to order continued wound care as needed to prevent infection.

PA Eves states that she is certain Marine did not tell her multiple times about problems with his leg wound and that she never promised to put him on a list, as he claims. She reports that if he had mentioned a complaint to her outside the clinic setting, she would have reminded him of the HCADC procedure for inmates to file a Health Services Request form to seek medical attention. Records indicate that Marine had been instructed on how to use such forms.

PA Eves states that at no time did she deny or delay treatment for Marine's dog bite wounds. She also reports that she was not aware at any time that anyone at HCADC provided Marine with insufficient care or in any way placed his health at risk. In summary, PA Eves states: "I saw [Marine] the first day he arrived, one week later, and two weeks after his arrival. He appeared to be healing slowly but appropriately. I never observed or learned (and the records do not show) that Mr. Marine had any sign of infection." (Docket Item No. 72-1 at ¶ 9.)

Dr. Jerkins was employed by Wellpath as a regional medical director in August and September 2022. During the time when PA Eves provided direct patient care at HCADC, she worked under Dr. Jerkins's medical license. The doctor has reviewed PA Eves's provider notes from August 19 and September 1, 2022, as well as Marine's allegation that PA Eves prematurely removed the leg sutures from his

left leg on August 21, 2022. Dr. Jerkins is confident that he would not have told Marine that PA Eves prematurely removed the stitches. First, the doctor asserts that he would never say such a thing to a patient, as such a statement would be irrelevant to his own diagnoses or treatment decisions for the patient. Second, Dr. Jerkins does not agree with Marine's contention that his stitches were prematurely removed. The doctor states it would have been reasonable for PA Eves to remove the sutures from Marine's dog bite wound when she first saw him on August 19, 2022, or at any time thereafter. The doctor reports that dog bites present a high risk of infection because of the risk of direct exposure to bacteria from the dog's mouth. Dr. Jerkins opines that when a provider is presented with a dog bite wound, it is common practice to leave the wound open or, at least, to leave sutures loose and to remove them if signs of infection are detected during follow-up wound care. Therefore, the doctor states, in his professional judgment, it was prudent of PA Eves to remove the sutures from Marine's dog bite wound to reduce the risk of infection or to aid in treatment of a wound infection.

### 3. *Applicable Law.*

Marine does not indicate whether his claims about his medical care at the jail occurred while he was a pretrial detainee or after he had been convicted and sentenced. The difference in status affects the legal standard to be applied, since jail conditions claims of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment standard that governs medical claims by convicted felons serving custodial sentences. *See Short v. Hartman*, 87 F.4th 593, 608-09 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024). Because the evidence indicates that Marine's dog bite injuries at issue in

this case occurred before he was booked into HCADC, the court will apply the Fourteenth Amendment analysis to his claims here.[7]

> [A] pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.[8]

*Short*, 87 F.4th at 611. A disagreement about the type of care a detainee receives, as opposed to lack of care, cannot provide the basis for a § 1983 claim. *See Stevens v. Holler*, 68 F.4th 921, 933 (4th Cir. 2023) (recognizing that detainee's mere disagreement over scope of proper medical care is insufficient to establish deliberate indifference absent exceptional circumstances) (*abrogated on other grounds by*

---

[7] For reasons herein explained, the court concludes that defendant PA Eves is entitled to summary judgment under the Fourteenth Amendment legal standard as to Marine's § 1983 medical claims against PA Eves. Because Marine fails to meet the objective standard, as required under the Fourteenth Amendment, the court need not determine whether he can satisfy the more stringent, subjective deliberate indifference standard applicable in Eighth Amendment cases. *See Short*, 87 F.4th at 611 (holding in detainee claims, subjective showing of deliberate indifference "remains sufficient, but it is no longer necessary").

[8] Marine misstates the law when he claims that "[i]t is Defendant's burned [sic] to demonstrate that the whole of P/A Eve's [sic] actions and in-actions were not the cause of the ensuing infection, swelling and nerve damage. All of which caused the leg not to heal properly." (Docket Item No. 70 at 2.) He also asserts that PA Eves and Dr. Jerkins must provide clinical documentation to support their stated medical knowledge and judgment about when to safely remove stitches from a dog bite wound. (Docket Item No. 70 at 3.) On the contrary, Marine, as plaintiff, has the burden of proof on causation; he must present facts in dispute on which he could persuade a fact finder that PA Eves's actions or inactions (a) were not reasonable to address the risk his condition posed and (b) caused him harm. *See Short*, 87 F.4th at 611.
Marine also erroneously claims that the defendant's summary judgment motion is premature because she filed it before he had received all discovery materials he desired. In fact, PA Eves filed her motion within the timeline allotted by the court, (Docket Item No. 55), and Marine has had over a year to complete discovery.

*Short*, 87 F.4th at 616).   Rather, the challenged treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Stevens,* 68 F.4th at 933.  Allegations "that [a] defendant negligently or accidentally failed to do right by the detainee" regarding medical care does not rise to constitutional proportions.  *Short*, 87 F.4th at 611-12.  Finally, "the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

## 4. *Discussion*.

In response to PA Eves's motion, Marine frames his claims against her as follows: (1) "the sutures were removed prematurely"[9] and (2) "the after-care when [he] arrived at the jail" was deficient, namely, "the wound wasn't cleaned and dressed by medical properly, Bactrim was prescribed but not give[n] in a timely manner as to stop or prevent infection, medical requests were ignored."  (Docket Item No. 70 at 1.)  After careful review of the record, the court finds that PA Eves is entitled to summary judgment on both claims.

As an initial matter, Marine cannot prevail on any claim against PA Eves in her official capacity.  "State officers sued for damages in their official capacity are not 'persons' for purposes of [a § 1983 action] because they assume the identity of the government that employs them." *Hafer v. Melo*, 502 U.S. 21, 27 (1991).  State

---

[9]  Marine also states that any consent he gave to removal of the stitches was "under duress," because he "believed that premature removal would cause further damage." (Docket Item No. 70-1 at 1.)  PA Eves states that she had Marine's consent and that she would never force treatment on a patient without his consent.  The court does not find this dispute to be material to the claim presented in Marine's Amended Complaint, which contends that PA Eves removed the stitches too early, before the wound was healed.  (Docket Item No. 35 at 4.)  It is well-established that the plaintiff cannot amend his complaint through a response to summary judgment, *see Jones v. W. Tidewater Reg'l Jail*, No. 2:15cv316, 2016 WL 10489895, at *4 (E.D. Va. Feb. 17, 2016), and Marine did not file a second amended complaint at any time to raise a claim of forcible medical care.

officials or individuals acting under color of state law in their personal capacities, on the other hand, are persons subject to suit under § 1983. *See Hafer*, 502 U.S. at 31. PA Eves is subject to suit under § 1983 in her individual capacity as a health care professional providing medical care to state inmates.

As stated, the court must apply the four-part Fourteenth Amendment legal analysis outlined in *Short*, 847 F.4th at 611. The undisputed facts, taken objectively and in the light most favorable to Marine, demonstrate that the dog bite wound on his leg presented a medical condition that posed a substantial risk of serious harm. Although describing Marine's symptoms as "moderate," the Sovah ED doctor determined that treatment was necessary for the injuries and applied loose sutures to the injury. Thus, the court concludes that Marine has satisfied the first part of the analysis as to his claims against PA Eves. *See Short*, 87 F.4th at 612 (finding that "[a] condition is objectively serious if it is diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").

The evidence does not support Marine's claims on the second or third parts of the *Short* analysis, however. He complains, vaguely, that PA Eves provided inadequate care when he arrived at HCADC on August 19, 2022. This is not a case where the defendant allegedly failed to provide any treatment. To the contrary, the evidence shows that PA Eves met with Marine, assessed his overall condition, examined his injuries and reviewed the treatment he already had received at the Sovah ED for the dog bites. She provided an antibiotic to prevent infection and another medication to alleviate pain.[10] She noticed the loose sutures to the leg

---

[10] After the initial pain medication ran out, nursing staff entered an order on August 25, 2022, for ibuprofen for Marine.

laceration and explained to Marine her medical judgment that removing the stitches would help prevent infection to a dog bite wound.  When Marine declined having the sutures removed, PA Eves let them be, had the wound cleaned and dressed, ordered daily dressing changes[11] and planned a follow up in two weeks when he had completed the antibiotic.  Marine's vague complaint about the way the wound was cleaned or dressed that day states, at most, a disagreement with the care provided. He presents no medical evidence to support his inexpert opinion and, indeed, does not describe how this initial care should have been different.  In the face of PA Eves's detailed account and the medical records, Marine presents no disputed fact on which he could persuade a jury that PA Eves knew or should have known her actions that day did not appropriately address Marine's medical needs.

Marine next claims that the stitches "were mandated" not to be removed for 10 to 14 days, but that PA Eves wrongfully removed the "unhealed stitches" on August 21, 2022, only two days after the Sovah ED doctor applied them.  (Docket Item No. 35 at 4, 9.)  But Marine has presented no medical documentation showing that the removal occurred on that date.  The medical records also do not support Marine's claim that any provider had recommended or ordered for the stitches to remain for at least 10 days.  The Sovah ED wound care notes expressly leave the removal decision to Marine's next provider, who was PA Eves.  (Docket Item No. 65-1 at 12.)  PA Eves reports that she recalls removing the stitches a week after Marine's arrival at HCADC, although she has no written documentation of that event.  She remembers that Marine agreed to the procedure after she had explained the medical basis for removal—to decrease the risk of infection.  Dr. Jerkins also

_____

[11] PA Eves states that she usually did the initial wound care and, thereafter, the nursing staff would perform later dressing changes and report to PA Eves any signs of infection.  If the nurses felt healing was progressing with no complications, PA Eves likely would not see the patient again.  (Docket Item No. 72-1 at n.1.)

bolsters PA Eves's medical reasoning by explaining the common practice to leave a dog bite wound open to reduce the high risk of infection due to exposure to bacteria from the dog's mouth. (Docket Item No. 65-2 at ¶ 4.)

Whether the removal of Marine's stitches occurred after two days or seven days, the evidence does not support the second or third parts of Marine's claim under *Short*. These parts of the analysis require showing that PA Eves knew or should have known that her action of removing the stitches posed an unjustifiably high risk of harm. Marine has presented no disputed material facts on which he could persuade a jury to reach such a finding. Rather, the evidence shows that PA Eves acted as she did because medical expertise counseled against stitching up a dog bite wound. Marine's personal disagreement with PA Eves's treatment choice is not sufficient to support his constitutional claim.

As to the fourth part of the *Short* analysis, Marine fails to provide any factual matter showing that PA Eves's initial treatment on August 19, 2022, or her removal of the stitches *caused* the infection and other complications Marine has experienced since the dog bite incident. As discussed, Dr. Jerkins offers his professional judgment that removal of Marine's stitches at any time, or leaving the wound unstitched, was consistent with recommended and common practice to reduce infection risk with dog bite injuries. This evidence directly contradicts Marine's assertion that Dr. Jerkins made any statement that PA Eves's handling of Marine's stitches was inappropriate. PA Eves's orders for antibiotics, prescribing one drug initially and a different one in mid-September, reflect her continued efforts to fight against infection. Moreover, other than slow healing of the wound, medical records reflect that the complications of which Marine complains—blood clots in his legs, enlarged pulmonary artery, a mass in his torso and need for treatment of thrombophlebitis and pain management—developed long after PA Eves changed jobs and no longer was his provider. While these conditions may have some

relationship to the dog bite, Marine presents no evidence that any of them was caused by the timing of PA Eves's removal of his stitches or any other treatment she provided, or failed to provide, to him.  For these reasons, the court concludes that PA Eves is entitled to summary judgment as a matter of law as to Marine's first § 1983 claim.

Marine's second claim alleges various dissatisfactions with care he received after removal of the stitches.  The Amended Complaint contends that PA Eves failed to provide pain medication for undated, unspecified complications and did not carry out unspecified treatment prescribed by other providers.  *See Marine*, 2024 WL 1201616, at *2.  Marine's response to the defendant's motion asserts details not presented in his Amended Complaint.  He states that "multiple times" PA Eves came through the jail and said she was putting him on the list, but did not write anything down, and he was not called to medical or seen by her.  (Docket Item No. 70-1 at 2.) He complains that the prescribed antibiotic "Augmentin ran out around September 1-4," and his unspecified "requests for medical attention were ignored."  (Docket Item No. 70 at 2.)  He asserts that PA Eves saw him at his cell during evening count sometime around September 13, 2022, checked his leg and said he needed Bactrim, but he did not receive any for more than a week.  (Docket Item No. 70-1 at 2.)  He also alleges shortcomings in care from other unnamed people—"by medical" or "medical staff" or by the "wound care team."  (Docket Item No. 70.)

Given PA Eves's detailed account of her treatment efforts for Marine and the medical records, Marine's generalized allegations about medication delays and vague claims of inadequate wound care or recordkeeping do not suffice to defeat the defendant's summary judgment motion.  The undisputed evidence is that PA Eves was not the only medical provider at HCADC, was not the medical director, and she did not have authority to hire, fire, train, demote, promote or supervise any other

medical staff member.[12]   Liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in the violation of plaintiff's rights.  *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017).

It also is undisputed that PA Eves did not make medical appointments for inmates and in response to a verbal request for one, she would refer the inmate to file the proper form.  Marine complains of having his medical request forms ignored, but he offers no detailed allegations about when and for what purpose he filed such forms.  And after many months to conduct discovery, he offers nothing to refute the defendant's evidence (based on review of Marine's file) that while PA Eves was his provider between August 21 and September 27, 2022, he filed only one Health Services Request form, dated September 12, 2022.[13]  (Docket Item No. 72-1 at ¶ 6.) The form complained that Marine's leg was swollen, and the wound was hurting and leaking yellow pus-like fluid.  (Docket Item No. 65-1 at 38.)  In response to that Request, a nurse examined Marine the next day, noting a small amount of drainage and an upcoming scheduled appointment with the provider.  The nurse documented this exam as routine, not urgent or emergent.  PA Eves states that "[i]t is not unusual for a healing wound to have a small amount of drainage," and the nurse's report did not indicate infection or an urgent need for another exam or different treatment.

---

[12]  As the defendant points out, Marine has not stated facts to support a supervisory claim against PA Eves regarding any of the claimed deficiencies in his care from other medical staff members during her tenure at HCADC.  *See Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (holding that supervisory liability only arises where "[a] supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.").  A plaintiff bringing a supervisory liability claim bears a heavy burden of proof, *see Miltier v. Beorn*, 896 F.2d 848, 855 (4th Cir. 1990), a burden that Marine simply has not met.

[13]  In Marine's responses to the defendant's motion, he complains that he has not received all discovery materials that he requested, including his medical request forms.  The record indicates, however, that Marine has never filed a motion seeking to compel additional discovery, and the defendant has reported no record of additional request forms filed during PA Eves's tenure.

(Docket Item No. 72-1 at ¶ 6.)   The record indicates that orders were entered on September 23, 2022, under PA Eves's name for wound care (14 days) and for the antibiotic Bactrim (10 days) as a precaution against infection, although PA Eves had not received any report that Marine's leg wound was showing signs of infection at that time.   Records indicate that Marine did not file any Health Services Request form complaining about lack of antibiotics or wound care.

In short, the court finds that Marine has not presented any genuine issue of material fact on which he could persuade a jury that any action PA Eves took or failed to take during her initial exam or thereafter violated his rights under the Fourteenth Amendment.   Although Marine had an injury posing a significant risk of serious harm, he provides no evidence that PA Eves failed to respond reasonably to that risk or that any action she took increased the risk of harm or caused harm.   *See Short*, 87 F.4th at 611.

### III. CONCLUSION.

In accordance with the foregoing, the court concludes that PA Eves is entitled to summary judgment as a matter of law and will grant her motion as to Marine's § 1983 claims.   The court also will grant PA Eves's Motion to Dismiss Marine's medical malpractice claim against her.   Next, the court will dismiss as moot the defendant's motion seeking dismissal of this case under rulings by the Bankruptcy Court for the Southern District of Texas, related to the bankruptcy proceedings of PA Eves's former employer, Wellpath LLC, (Docket Item No. 89.)   Finally, the court will grant defense counsel's motion seeking to withdraw as counsel of record and to substitute Allison J. Becker, Esq., (Docket Item No. 92).

An appropriate Order will be entered with this Opinion.


**ENTERED:** September 18, 2025.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE